IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL FEDERATION OF<br>INDEPENDENT BUSINESS<br><br>   1201 F Street, N.W. Suite 200<br>   Washington, D.C. 20004,<br><br>                    Plaintiff,<br><br>   v.<br><br>THE ARCHITECTURAL AND<br>TRANSPORTATION BARRIERS<br>COMPLIANCE BOARD<br>a/k/a ACCESS BOARD<br><br>   1331 F Street, NW, Suite 1000<br>   Washington, DC 20004-1111<br><br>and<br><br>JAN TUCK, in her official capacity as Chair,<br>Architectural and Transportation Barriers<br>Compliance Board a/k/a Access Board<br><br>   1331 F Street, NW, Suite 1000<br>   Washington, DC 20004-1111<br><br>                    Defendants. | Civil Action No. _____ |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

289128_3

## INTRODUCTION

1.      This action concerns a Final Rule issued by the Architectural and Transportation Barriers Compliance Board (the "Access Board") on July 23, 2004,[1] that will have a significant economic impact on many small businesses all across America – an impact which the Access Board completely and improperly ignored in the rulemaking process, in defiance of the requirements of the Regulatory Flexibility Act, 5 U.S.C. §§ 601-612 ("RFA") (as amended by the Small Business Regulatory Enforcement and Fairness Act of 1996).[2] The RFA required the Board, in promulgating the "Final Revised Accessibility Guidelines for the Americans with Disabilities Act and the Architectural Barriers Act" (the "Revised ADA Guidelines"), to conduct a regulatory flexibility analysis that would have, *inter alia*, considered regulatory alternatives to minimize the impact of the final rule on small entities. Instead of conducting this analysis, the Board issued an arbitrary and capricious certification that the Revised ADA Guidelines are not expected to have a significant economic impact on the new construction and alteration of facilities by a substantial number of small entities.

2.      Plaintiff National Federation of Independent Business ("NFIB") brings this action on behalf of the small businesses that will be adversely affected by the rule to challenge the Access Board's arbitrary and capricious certification of no significant economic impact, and to require the Board to conduct a regulatory flexibility analysis as required by the RFA. As set forth *infra*, the certification violated the RFA because, among other things, the Access Board

---

[1]      Americans with Disabilities Act (ADA) Accessibility Guidelines for Buildings and Facilities, 69 Fed. Reg. 440,823 (July 23, 2004) (to be codified at 36 C.F.R. pts. 1190 & 1191).

[2]      Small Business Regulatory Enforcement and Fairness Act of 1996, Pub. L. No. 104-121, Title II, 110 Stat. 864-67.

considered absolutely no evidence or data pertaining to small entities in making it. Instead, the Board based its certification on a fatally flawed determination that the Revised ADA Guidelines would not increase new construction and/or alteration costs for covered facilities (without distinguishing between small and other entities) by more than .5 percent. This determination was not a valid basis for the Access Board's certification because it is (a) facially irrelevant to the question of how the Revised ADA Guidelines will economically impact *small entities*, and (b) is a gross understatement of the actual cost impact of the Revised ADA Guidelines. NFIB requests that the Court declare the Access Board's certification invalid and order the Access Board to conduct a regulatory flexibility analysis as required by law. In addition, NFIB requests that the Court declare that the requirements of the Revised ADA Guidelines are not a valid basis for any agency rulemaking by any other federal agencies until the Access Board conducts a proper regulatory flexibility analysis in accordance with the RFA/SBREFA.

## PARTIES

3.      Plaintiff NFIB is a non-profit corporation organized under the laws of the State of California. It is the nation's oldest and largest non-profit national organization dedicated to representing the interests of small-business owners throughout all 50 states. In 2000, NFIB established a Legal Foundation to protect small businesses from burdensome and costly government regulations, and to ensure, through the vehicle of judicial review, that federal and state regulators faithfully abide by the laws that were enacted to protect America's small businesses. One such statute is the RFA. In the last five years, NFIB has brought two actions challenging violations of the RFA by federal agencies.

4.      NFIB has 600,000 members. NFIB's national membership owns a wide variety of America's small businesses, many of which are public accommodations that will be adversely

affected by the Revised ADA Guidelines. NFIB's members independently own and operate their businesses and are not dominant in their field of operations. The majority of NFIB members have five employees, gross sales of approximately $350,000 per year, and net profits of $40,000 to $50,000 annually. NFIB members own and/or operate public accommodations such as restaurants, retailers, drycleaners, professional and other service providers, day care centers, transient lodgings, recreational facilities and health clubs.

5. Defendant Access Board is an independent federal agency established by Section 502 of the Rehabilitation Act, as amended, whose primary mission is to promote accessibility for individuals with disabilities. The Access Board consists of twenty-five members. Twelve of those members are representatives of federal agencies (the Departments of Health and Human Services, Education, Transportation, Housing and Urban Development, Labor, Interior, Defense, Justice, Veteran's Affairs, and Commerce; General Services Administration, and the United States Postal Service) and the other thirteen are members of the public appointed by the President without the advice and consent of the Senate.

6. Defendant Jan Tuck is the Chair of the Access Board and is named as a defendant in her official capacity.

### JURISDICTION AND VENUE

7. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 5 U.S.C. § 611 (RFA judicial review provision), and 28 U.S.C. §§ 2201-02 (Declaratory Judgment Act).

8. The declaratory relief sought by NFIB is authorized under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, and Federal Rule of Civil Procedure 57.

9.  The injunctive relief sought by NFIB is authorized by the RFA, 5 U.S.C. § 611(a)(4).

10. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(e) and 5 U.S.C. § 703.

## STATEMENT OF FACTS

### Requirements of the Regulatory Flexibility Act

11. In 1980, Congress enacted the RFA after finding that small businesses bear a disproportionate share of the costs and burdens associated with federal regulatory actions, and that alterative regulatory approaches may be available that would minimize the significant economic impact of rules on small businesses without compromising statutory objectives. Congress passed the RFA to require agencies to consider meaningfully the impact of their regulations on small entities and to require them to consider alternatives during the rulemaking process.

12. Sixteen years later, Congress enacted the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA) to, *inter alia*, provide a private right of action for small entities that are adversely affected by final agency action to obtain judicial review of an agency's compliance with key provisions of the RFA. Congress found that judicial review was necessary because the requirements of the RFA "ha[d] too often been ignored by government agencies, resulting in greater regulatory burdens on small entities than necessitated by statute." P.L. 104-121, § 202(5)-(6).

13. The RFA (as amended by SBREFA) states that "whenever an agency is required. . . to publish a general notice of proposed rulemaking for any proposed rule, the agency shall

prepare and make available for comment an initial regulatory flexibility analysis. . . [(IRFA)]" that "describe[s] the impact of the proposed rule on small entities." 5 U.S.C. § 603(a). The IRFA must contain certain elements, including "an estimate of the number of small entities to which the proposed rule will apply" and "a description of any significant alternatives to the proposed rule which accomplish the stated objectives of applicable statutes and which minimize any significant economic impact of the proposed rule on small entities." 5 U.S.C. § 603(b).

14. The RFA states that "when an agency promulgates a final rule. . . after being required. . . to publish a general notice of proposed rulemaking. . . the agency shall prepare a final regulatory flexibility analysis." 5 U.S.C. § 604(a). The statute specifies, *inter alia*, that the regulatory flexibility analysis must include (1) "a description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available"; and (2) "a description of the steps that the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of the applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected." 5 U.S.C. §§ 604(a)(3) & (5).

15. The RFA exempts an agency from the requirement to conduct a regulatory flexibility analysis for a proposed or final rule "if the head of the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." The statute requires that the certification be accompanied by "a statement providing the factual basis of such certification." 5 U.S.C. § 605(b). The requirement for a "factual basis" for the certification -- as opposed to "the reasons" – was added to the RFA by SBREFA in 1996.

**The Regulatory Framework of Title III of the ADA**

16. Title III of the Americans with Disabilities Act (ADA) prohibits discrimination against the disabled by public accommodations and commercial facilities – a goal that NFIB fully supports. 42 U.S.C. §§ 12182 (a), 12183(a). The ADA defines discrimination to include, *inter alia*, a failure to make public accommodations and commercial facilities accessible to the disabled. 42 U.S.C. §§ 12182(b), 12183(a)(1) and (2).

17. The ADA directed the Access Board to develop "minimum guidelines" for accessibility for new and altered public accommodations and commercial facilities by May 26, 1991. *See* 42 U.S.C. § 12204. The ADA also required the Department of Justice ("DOJ") to issue implementing regulations by July 26, 1991, and *explicitly specified that such regulations "be consistent with the minimum guidelines and requirements" issued by the Access Board*. 42 U.S.C. § 12186(b) & (c) (emphasis added). The Access Board has interpreted this mandate to mean that its guidelines "serve as the minimum baseline" for the DOJ's ADA regulations. In other words, the Access Board maintains that the DOJ cannot adopt accessibility standards in its regulations that are less stringent than those issued by the Access Board. On July 26, 1991, the Access Board issued the ADA Accessibility Guidelines (ADAAG), and the DOJ adopted them in their entirety into its regulations on the same day. 28 C.F.R. Part 36 (Appendix A).

18. The ADAAG occupies 90 pages in the Code of Federal Regulations. The ADAAG specifies (1) every element of a public accommodation and/or commercial facility that must be accessible; (2) how many of each element must be accessible; and (3) the details of how to make each element accessible. Some of the elements covered include accessible routes (*e.g.* curb ramps, ramps, width, slope, and cross slopes of paths, elevators, platform lifts, walking

surfaces, doors), parking, communication elements (*e.g.* alarms and telephones), ATMs, and bathrooms. Many of the ADAAG provisions are very complex, contain highly technical language, reference other technical documents, and are not easily understood by people who do not have special training on accessibility requirements.

19. Facilities constructed for first occupancy after January 26, 1993, or altered (defined by DOJ regulations as a change that affects or could affect the usability of the building or facility) after January 26, 1992, must comply with the ADAAG except where it would be structurally impracticable (new construction), or not be feasible (alterations) to do so. Neither an entity's size or financial ability to comply with the ADAAG nor the cost of compliance are considerations under either of these standards. Facilities that were constructed for first occupancy prior to January 26, 1993, are governed by a less stringent standard that requires the removal of barriers if such removal is readily achievable.

**The Rulemaking Process for the Revised Accessibility Guidelines**

20. In 1994 -- three years after issuing the ADAAG -- the Access Board began working on a comprehensive revision. That effort resulted in the publication of a Proposed Rule in the Federal Register on November 16, 1999. The Access Board did not conduct a regulatory flexibility analysis in connection with the Proposed Rule, and instead issued a baseless certification that the rule would not have a significant economic impact on a substantial number of small entities. NFIB, as well as the Small Business Administration, both filed comments in response to the Proposed Rule. In their comments, they objected to the certification and insisted that the Access Board conduct a regulatory flexibility analysis.

21. The Access Board did not comply with the SBA or NFIB's requests. On July 23, 2004, the Access Board published the 300-page Revised ADA Guidelines as a Final Rule in the

Federal Register without having conducted a regulatory flexibility analysis. *See* 69 Fed. Reg. 44083.

**Requirements of the Revised Accessibility Guidelines that Will Adversely Impact Small Entities**

22. All public accommodations – including those that are small entities -- will have to comply with the Revised ADA Guidelines when the DOJ incorporates them into its regulations. That incorporation process is a certainty and is already underway. On October 4, 2004, the DOJ issued an Advanced Noticed of Proposed Rulemaking (the "ANPRM") "to adopt design standards that are consistent with the Revised ADA Accessibility Guidelines." The DOJ stated in the ANPRM that "[t]he ADA requires the Department to publish regulations that include accessibility standards *that are consistent with the Access Board's guidelines*." (emphasis added).

23. The DOJ's position that it must adopt regulations that are "consistent" with the Revised ADA Guidelines means that any RFA analysis that the DOJ might conduct in the future relating to the economic impact of the Revised ADA Guidelines on small entities will come too late in the process to have any impact on their substantive requirements. Even if the DOJ were to consider alternatives with less impact on small entities as the Access Board should have done, the DOJ would not have the ability to adopt such alternatives in its regulations. For this reason, a regulatory flexibility analysis of the Revised Accessibility Guidelines should have taken place during the Access Board rulemaking process, before the Access Board issued them as a Final Rule.

24. The types of public accommodations that will be required to comply with the Revised ADA Guidelines once they are incorporated into the DOJ regulations include, but are

not limited to: restaurants, bars, retailers, dry cleaners, professional and other service providers, day care centers, theatres, parking lots and garages, parks, schools, museums, galleries, transient lodgings (even those with only one guestroom), health clubs, and recreation facilities. Many of these public accommodations are owned and operated by small entities.

25. The Revised ADA Guidelines impose a number of new requirements on public accommodations constructed for first occupancy after January 26, 1993, or altered after January 26, 1992, that will have a significant monetary impact on small entities, including the following:

- increasing the number of required van accessible parking spaces to one in every six accessible spaces from one in eight.

- increasing the percentage of public entrances which must be accessible from 50 to 60 percent and, in the case of facility with two entrances, requiring *both* to be accessible.

- a new requirement (with some exceptions) that circulation paths *inside of employee work areas* that are larger than 1000 square feet comply with accessibility requirements.

- a new requirement that platform lifts have power-operated doors (for lifts serving more than two landings) and self-closing doors (for lifts serving two or fewer landings). The ADAAG only requires that platform lifts have doors with maneuvering clearance *or* be power-operated.

- a new requirement that at least 5% of sinks in each accessible space comply with the technical requirements for sinks, including knee and toe clearance, clear floor space, height, faucets, and insulated pipes and surfaces. The ADAAG does not specify the number of sinks that must accessible.

- a new requirement that if non-accessible guest rooms in transient lodging facilities have a vanity, the accessible guest rooms must have a comparable vanity. There is no existing requirement under ADAAG.

- a new set of specifications for handrails along walkways if handrails are provided. No such specifications exist under the ADAAG.

- A new requirement that sliding doors that are part of an accessible route have thresholds of ½ inch or less. The ADAAG allows thresholds for such doors to be ¾ an inch high.

- A new restriction which does not allow a lavatory to be located within the minimum mandatory clear floor space around an accessible toilet. The ADAAG allows the lavatory to be located within this clear floor space.

- A new requirement that at least one window in accessible guest rooms must meet accessibility requirements such as special hardware that can be operated with one hand and does not require tight grasping, pinching, or twisting of the wrist and operable parts that are no higher than 48" from the finished floor. The ADAAG has no such requirement.

**The adverse impact of the Access Board's Failure to conduct a Regulatory Flexibility Analysis on NFIB.**

26. As previously set forth in Paragraph 3, one of the purposes of NFIB is to protect small businesses from burdensome and costly regulations and to ensure that agencies follow the laws that have been enacted to advance this important objective. By failing to conduct a regulatory flexibility analysis, the Access Board has caused NFIB to divert its resources to challenging its unlawful acts. In the absence of such acts, NFIB could have directed these resources to other endeavors to advance the organization's mission, such as focusing on public policy at the state and federal level and acting as a key business resource for small and independent business in America.

**The Access Board's Failure to Comply with the Regulatory Flexibility Act**

27. The Access Board did not conduct a regulatory flexibility analysis in connection with the Revised ADA Guidelines as required by 5 U.S.C. § 604. Instead, it falsely certified that "the final revised guidelines are not expected to have a significant economic impact on the new construction and alterations of facilities by a number of small entities."

28. The Access Board based its certification on the regulatory assessment it prepared for the Revised ADA Guidelines pursuant to Executive Order 12866 (the "Regulatory Assessment"). According to Chapter 10 of the Regulatory Assessment, the Access Board found

"no significant economic impact on the new construction and alterations of facilities by a number of small entities" for two reasons: (1) The Revised ADA Guidelines add only a maximum of .1 to .5 percent to the total construction costs of (a) office buildings, (b) hotels, (c) hospital and nursing homes, and (d) federal, state, and government housing; and (2) The Revised ADA Guidelines reduced certain existing requirements that would allegedly benefit small entities. The Access Board cited a total of three examples of requirements in this category: Entities with four or fewer parking spaces would not have to provide signage identifying accessible spaces; doctors' offices with clustered toilet rooms are not required to make each one accessible; and high schools are not required to provide accessible routes to small press boxes.

29. The Access Board's certification of no significant economic impact was arbitrary, capricious, and not in accordance with law for a number of reasons, including but not limited to, the following:

a) First, the Access Board did not consider *any data or other information relating to small entities* in certifying that the Revised ADA Guidelines would not have a significant impact on a substantial number of them. The Access Board's only supposed factual basis for its certification – the *conclusion* that the Revised ADA Guidelines adds only a maximum of .1 to .5 percent to the total construction costs of (a) office buildings, (b) hotels, (c) hospital and nursing homes, and (d) federal, state, and government housing – regardless of their size -- is completely irrelevant to the question of the economic impact of the Revised ADA Guidelines *on small entities*. The .1 to .5 percent figure purports to be an average increase in cost that applies to all entities, large and small, and, therefore, provides no basis for a conclusion that the Revised ADA Guidelines would not have a significant impact on a substantial number of small entities.

      b)      Second, in concluding that the Revised ADA Guidelines will only add a maximum of .5 percent to the total costs of new and altered facilities, the Access Board only examined four types of facilities: (a) office buildings, (b) hotels, (c) hospital and nursing homes, and (d) federal, state, and government housing. This analysis is obviously incomplete because it does not include the increased costs imposed on the many other types of public accommodations that will be covered by the Revised ADA Guidelines, such as retailers, restaurants, small manufacturers, and service providers.

      c)      Third, the Access Board's conclusion that the Revised ADA Guidelines will only add a maximum of .5 percent to the total costs of new and altered facilities was based on a fatally flawed analysis that did not consider any cost data concerning projects involving alterations if the overall cost for the project was less than $100,000. Thus, the Access Board's conclusion that the Revised ADA Guidelines will only add a maximum of .5 percent to the total cost of new and altered facilities completely ignores the cost impact of the Revised ADA Guidelines on the types of alterations that *small* entities are most likely to make – those under $100,000.

      d)      Fourth, the Access Board arbitrarily and incorrectly assumed that certain changes would result in only minimal costs and did not analyze or include such costs in reaching the total cost amount. Some of the costs that the Access Board failed to include are as follows: (a) the new requirement that there be a circulation path within employee work areas of 1000 square feet or more which must comply with all accessibility requirements; (b) the increase in the number of accessible public entrances required from 50 to 60 percent or to both entrances where there are only two; (c) the new requirement that 5 percent of sinks in accessible spaces comply with accessibility requirements; (d) the new requirements for assembly areas requiring

that accessible seats must provide sightlines over seated and standing spectators and viewing angles that are substantially equivalent to, or better than, the choices of seating locations an viewing angles available to other spectators; and (e) the new requirement that sliding doors cannot have thresholds more than ½ inch high.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the RFA/SBREFA

30. Plaintiff NFIB incorporates by reference paragraphs 1 through 29 above.

31. 5 U.S.C. § 611 provides that a small entity adversely affected by final agency action in connection with a rule is entitled to judicial review of the agency's compliance with the RFA, including the requirement to conduct a regulatory flexibility analysis under, *inter alia*, 5 U.S.C. §§ 603-605.

32. The Revised ADA Guidelines are a "rule" under the RFA, 5 U.S.C. § 601(2), because the Access Board was required to and did publish a general notice of proposed rulemaking for them pursuant to 5 U.S.C. §553(b).

33. The Revised ADA Guidelines, as set forth at 69 Fed. Reg. 44083, constitute "final agency action" by the Access Board because, *inter alia*, the minimum standards of accessibility they contain cannot be modified by any entity, including the DOJ.

34. The Access Board was required to comply with the RFA (as amended by SBREFA) in connection with the promulgation of the Revised ADA Guidelines.

35. The Access Board violated the RFA, 5 U.S.C. § 604, by failing to conduct a regulatory flexibility analysis and instead provided an invalid and baseless certification that the

Revised ADA Guidelines would not result in a significant economic impact on a substantial number of small entities.

36. Small entities that own or operate public accommodations and who are members of NFIB are adversely affected by the Revised ADA Guidelines in that the guidelines contain new and/or more onerous accessibility requirements that will cause them to incur additional costs in the new construction and/or alterations of their facilities that they would not have incurred under the ADAAG.

## COUNT II
## Declaratory Judgment

37. Plaintiff NFIB incorporates by reference paragraphs 1 through 36 above.

38. There is an actual controversy between NFIB and the Access Board concerning the Access Board's compliance with the RFA in connection with its issuance of the Revised ADA Guidelines.

39. As set forth above, the Access Board failed to conduct a regulatory flexibility analysis for the Revised ADA Guidelines, and issued a baseless certification that the Revised ADA Guidelines will not have a significant economic impact on a substantial number of small entities.

40. This certification had no factual or legal basis and was, therefore, arbitrary, capricious, and contrary to the RFA.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiff NFIB respectfully requests the Court to:

1. Declare that

      (a)    the RFA (as amended by SBREFA) applies to the Revised ADA Guidelines;

      (b)    the Access Board violated the RFA/SBREFA by failing to conduct the analyses required under RFA/SBREFA prior to issuing the Revised ADA Guidelines as a final rule;

      (c)    the Access Board's certification that the Revised ADA Guidelines have no significant economic impact on a substantial small entities is invalid; and

      (d)    the requirements of the Revised ADA Guidelines are not a valid basis for any agency rulemaking until the Access Board conducts a proper regulatory flexibility analysis or provides a valid certification in accordance with the RFA/SBREFA.

   2.    Pursuant to 5 U.S.C. § 611, order the Access Board to

      (a)    rescind the Revised ADA Guidelines' status as Final Rule; and

      (b)    conduct a proper regulatory flexibility analysis or provide a valid certification in accordance with the RFA/SBREFA.

3. Such other relief as the Court deems just and proper, including attorneys' fees.

Dated: July 1, 2005

Respectfully submitted,

EPSTEIN BECKER & GREEN, P.C.

_____
Frank C. Morris, Jr.
(D.C. Bar No. 211482)
Minh N. Vu
(D.C. Bar No. 444305)
1227 25th Street, N.W.
Washington, D.C. 20037
(202) 861-0900
(202) 296-2882 (fax)

Counsel for Plaintiff

OF COUNSEL:

Karen R. Harned
(D.C. Bar No. 456803)
Elizabeth Gaudio
(D.C. Bar No. 458688)
NFIB Legal Foundation
1201 F Street, NW
Suite 200
Washington, DC 20004
Telephone: (202) 314-2061
Facsimile: (202) 484-1566

Counsel for Plaintiff