IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATIONAL FEDERATION OF INDEPENDENT BUSINESS' | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| THE ARCHITECTURAL AND TRANSPORTATION BARRIERS COMPLIANCE BOARD A/K/A ACCESS BOARD ET AL., | ) ) ) ) | Civil Action No. 1:05CV01329  The Honorable Paul L. Friedman |
| Defendants. | ) ) | |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Minh N. Vu
Frank C. Morris, Jr.
Epstein, Becker & Green PC
1227 25th Street, NW, Suite 700
Washington, DC 20037
(202) 861-0900 (telephone)
(202) 296 2882 (facsimile)

Counsel for Plaintiff

October 28, 2005

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................. 1

II.    BACKGROUND .................................................................. 4

    A.    NFIB's Stake In This Matter.................................... 4

    B.    The Legal and Regulatory Background ...................... 5

        1.    The Requirements of the Regulatory Flexibility Act...................... 5

        2.    The Regulatory Framework of Title III of the ADA ...................... 6

        3.    The Rulemaking Process for the Revised ADAAG........................ 8

        4.    The DOJ's Process for Adopting the Revised ADAAG And The Limitation On Its Ability To Go Below The Baseline Set By The Access Board ...................................................... 9

        5.    The Impact Of The Revised ADAAG On NFIB Members .......... 10

III.    ARGUMENT .................................................................... 11

    A.    NFIB Has Standing To Challenge the Access Board's Failure to Comply with the RFA on Behalf of its Members.................................. 12

    B.    NFIB's Claim Can Never Get More Ripe.................................. 16

    C.    The DOJ's Imminent Adoption Of The Revised ADAAG Does Not Change The Jurisdictional Analysis.......................................... 20

IV.    CONCLUSION ................................................................. 23

403279 v 2

## I.    INTRODUCTION

This action concerns the "Americans with Disabilities Act (ADA) Accessibility Guidelines for Buildings and Facilities" (the "Revised ADAAG") which the Architectural and Transportation Barriers Compliance Board (the "Access Board") issued as a final rule on July 23, 2004.  See 69 Fed. Reg. 44,083 (July 23, 2004) (codified at 36 C.F.R. pts. 1190, 1191).  The Access Board is the independent federal agency that is responsible, under the Americans with Disabilities Act (ADA), for issuing accessibility standards for all newly constructed and/or altered public accommodations and commercial facilities in the United States.  The Revised ADAAG is a 304-page comprehensive revision of the current accessibility standards under the ADA that are set forth in the Department of Justice (DOJ) regulations at 28 C.F.R. Part 36, Appendix A ("ADAAG").

NFIB has brought this lawsuit on behalf of its small business members who own and/or operate public accommodations and/or commercial facilities because the Access Board failed to perform a regulatory flexibility analysis prior to issuing the Revised ADAAG as a final rule, as required by the Regulatory Flexibility Act ("RFA") (as amended by the Small Business Regulatory Enforcement and Fairness Act of 1996).  See 5 U.S.C. §§ 601-612 (2005).[1]  The RFA required the Access Board to conduct a regulatory flexibility analysis that would have, inter alia, considered the impact of the Revised ADAAG on small entities as well as regulatory alternatives that could minimize the impact of the Revised ADAAG on them.  Instead of conducting this analysis, the Board issued an arbitrary and capricious certification that the Revised ADAAG is not

---

[1]    Small Business Regulatory Enforcement and Fairness Act of 1996, Pub. L. No. 104-121, 110 Stat. 847.

expected to have a significant economic impact on the new construction and alteration of covered facilities of a substantial number of small entities. NFIB seeks judicial review of the Access Board's baseless certification and failure to conduct the required regulatory flexibility analysis, and an order requiring the Access Board to conduct the regulatory flexibility analysis mandated by the RFA. In short, this case is not about the substance of the Revised ADAAG, but rather the illegal process by which it was issued.

The Court has jurisdiction to hear this controversy because NFIB has standing to bring this claim on behalf of its members, and the matter will never be more ripe. The injury to NFIB's members (1) took place more than a year ago when the Access Board issued the Revised ADAAG as a final rule without following the procedures mandated by the RFA that were designed to protect small businesses, (2) is clearly traceable to the Access Board which did not comply with the procedures, and (3) can be redressed by the Court's remand of the final rule back to the Access Board for compliance with the RFA. In addition, the D.C. Circuit very recently held that a challenge to an agency's compliance with the RFA such as this one becomes ripe as soon as the agency fails to comply with the RFA's procedures, regardless of whether the rule promulgated in violation of those procedures has been applied to anyone. See National Ass'n of Home Builders v. United States Army Corp. of Engineers, 417 F.3d 1272, 1282, 1286 (D.C. Cir. 2005).

The Access Board's argument that the injury to NFIB members is speculative until the DOJ finishes its process of incorporating the Revised ADAAG into its regulations is incorrect both legally and factually. The Supreme Court and the D.C. Circuit have both made clear that in a case involving the violation of a right to a legally

403279 v 2

mandated procedure, the injury that must be present to establish Article III standing is <u>the actual or imminent violation of the procedural right at issue</u>, not the harmful consequences that will flow from the enforcement of the rule that was issued in violation of the procedural right. <u>See</u> discussion <u>infra</u> at 14-17. The Access Board readily admits that it did not conduct a regulatory flexibility analysis prior to issuing the Revised ADAAG as a final rule as the RFA required. <u>See</u> Mem. in Supp. of Defs.' Mot. to Dismiss ("Motion to Dismiss") at 7. Thus, the injury to NFIB members – far from being remote or speculative – occurred more than a year ago on July 23, 2004, when the Access Board issued the Revised ADAAG as a final rule.

Factually, the Access Board's suggestion that the harm to NFIB's members is speculative because of the actions that the DOJ might take during its regulatory process is also incorrect. Both the Access Board and the DOJ have publicly pronounced on multiple occasions that the Revised ADAAG sets the minimum "baseline" for the DOJ's new regulations, and that the DOJ regulations must be "consistent" with the Revised ADAAG. <u>See</u> discussion <u>infra</u> at 7-10. If the DOJ cannot adopt accessibility standards for new and altered facilities that are less stringent than those contained in the Revised ADAAG, then there is nothing that the DOJ can or will do in its regulatory process to address or remedy the Access Board's failure to conduct the regulatory flexibility analysis that was required under the RFA. Thus, unless the DOJ formally advises the Court or the Court finds as a matter of law that DOJ <u>does</u> have full discretion to go below the "baseline" set by the Revised ADAAG for new and altered facilities (NFIB urges the Court to request input from the DOJ on this issue), there is no doubt that NFIB's

members will have to comply with the more onerous requirements of the Revised

ADAAG to their detriment.

## II.    BACKGROUND

### A.    NFIB's Stake In This Matter

Plaintiff NFIB is the nation's oldest and largest non-profit national organization

dedicated to representing the interests of small-business owners throughout all 50 states.

In 2000, NFIB established a Legal Foundation to protect small businesses from

burdensome and costly government regulations, and to ensure, through the vehicle of

judicial review, that federal and state regulators faithfully abide by the laws that were

enacted to protect America's small businesses.  One such statute is the RFA.  In the last

five years, NFIB has brought two other actions challenging violations of the RFA by

federal agencies.  See Compl. ¶ 3.  See also Decl. of Karen Harned ("Harned Decl.")

(Ex. A ¶ 2.)

NFIB has 600,000 members.  NFIB's national membership owns a wide variety

of America's small businesses.  NFIB's members independently own and operate their

businesses and are not dominant in their field of operations.  The majority of NFIB

members have five employees, gross sales of approximately $350,000 per year, and net

profits of $40,000 to $50,000 annually.  NFIB members own and/or operate public

accommodations such as restaurants, retailers, dry cleaners, professional and other

service providers, day care centers, transient lodgings, recreational facilities and health

clubs.  See Compl. ¶ 4; Harned Decl. ¶ 3.

John Carlson is an example of an NFIB member who must comply with any

accessibility standards adopted pursuant the ADA.  See Decl. of E. John Carlson ¶ 2 (Ex.

B).  Mr. Carlson is the owner of two commercial buildings in Fargo, North Dakota,

which house a bank, a dental office, and a restaurant – all public accommodations. Id. ¶ 4. Mr. Carlson's facilities have elements such as public restrooms, parking, and entrances that are all subject to regulation by the ADA. Id. ¶¶ 6-7. Mr. Carlson states that he has made alterations to these other elements at his buildings since he purchased them in 2003, and he intends to make additional alterations to his facilities in the next five years. Id. ¶¶ 6-7, 9. Future alterations will thus be subject to the minimum standards contained in the Access Board's Revised ADAAG as adopted by the DOJ.

**B.     The Legal and Regulatory Background**

**1.     The Requirements of the Regulatory Flexibility Act**

In 1980, Congress enacted the RFA to require agencies to consider the impact of their regulations on small businesses and seriously consider less burdensome regulatory alternatives during the rulemaking process. See S. Rep. No. 96-878, at 1-3, 11-13 (1980), as reprinted in 1980 U.S.C.A.A.N. at 2788-90, 2798-2800. Id. It goes without saying that an agency can only seriously consider less burdensome alternatives if it also has the authority to adopt them. Otherwise, the consideration would be meaningless.

Sixteen years later, Congress enacted the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA) to, inter alia, provide a private right of action for small entities that are adversely affected by final agency action to obtain judicial review of an agency's compliance with key provisions of the RFA. See 5 U.S.C. § 611. Congress found that judicial review was necessary because the requirements of the RFA "ha[d] too often been ignored by government agencies, resulting in greater regulatory burdens on small entities than necessitated by statute." Pub. L. No. 104-121, § 202(5)-(6).

An agency must comply with the RFA whenever, as in the case at bar, it is "required . . . to publish a general notice of proposed rulemaking for any proposed rule."

5 U.S.C. § 603(a) (2005).  The RFA directs the agency to prepare an initial regulatory flexibility analysis (IRFA) that "describe[s] the impact of the proposed rule on small entities."  Id.  The IRFA must contain certain elements, including "an estimate of the number of small entities to which the proposed rule will apply" and "a description of any significant alternatives to the proposed rule which accomplish the stated objectives of applicable statutes and which minimize any significant economic impact of the proposed rule on small entities."  5 U.S.C. § 603(b)(3), (c).

The RFA also requires agencies to prepare a final regulatory flexibility analysis before issuing a final rule.  See 5 U.S.C. § 604(a).   This final regulatory flexibility analysis must include (1) "a description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available";  and (2) "a description of the steps that the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected."  5 U.S.C. § 604(a)(3), (5).

An agency may only avoid conducting a regulatory flexibility analysis "if the head of the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities," and provides "a statement providing the factual basis for such certification."  5 U.S.C. § 605(b).

## 2.    The Regulatory Framework of Title III of the ADA

Title III of the ADA prohibits discrimination against the disabled by public accommodations and commercial facilities – a goal that NFIB fully supports.  42 U.S.C.

§§ 12182(a), 12183(a) (2005). The ADA defines discrimination to include, inter alia, a failure to make public accommodations and commercial facilities accessible to the disabled. See 42 U.S.C. §§ 12182(b), 12183(a)(1)-(2).

The ADA directed the Access Board to develop "minimum guidelines" for accessibility for new and altered public accommodations and commercial facilities by May 26, 1991. See 42 U.S.C. § 12204 (2005). The ADA also required the DOJ to issue implementing regulations by July 26, 1991, and explicitly specified that such regulations "be consistent with the minimum guidelines and requirements" issued by the Access Board. 42 U.S.C. § 12186(b)-(c) (emphasis added). The Access Board has interpreted this mandate to mean that its guidelines "serve as the minimum baseline" for the DOJ's ADA regulations. See http://www.access-board.gov/about/rulemaking.htm (a copy of this statement is at Exhibit C); see also Motion to Dismiss at 5 ("the Access Board's guidelines serve as the baseline for the DOJ's standards.") In other words, the Access Board maintains that the DOJ cannot adopt accessibility standards in its regulations that are less stringent than those issued by the Access Board. On July 26, 1991, the Access Board issued the first set of ADA Accessibility Guidelines (ADAAG), and the DOJ adopted them in their entirety into its regulations on the same day. See 28 C.F.R. § 36 (Appendix A) (2005).[2]

---

[2]    The ADAAG occupies 90 pages in the Code of Federal Regulations. Id. The ADAAG specifies (1) every element of a public accommodation and/or commercial facility that must be accessible; (2) how many of each element must be accessible; and (3) the details of how to make each element accessible. Some of the elements covered include accessible routes (e.g. curb ramps, ramps, width, slope, and cross slopes of paths, elevators, platform lifts, walking surfaces, doors), parking, communication elements (e.g. alarms and telephones), ATMs, and bathrooms. Id. Many of the ADAAG provisions are very complex, contain highly technical language, cross-reference other technical

Commercial facilities or facilities housing public accommodations constructed for first occupancy after January 26, 1993, or altered after January 26, 1992, must comply with the ADAAG, except where it would be structurally impracticable (in the case of new construction), or not feasible (in the case of alterations) to do so. See 42 U.S.C. §12183(a)(1)-(2); 28 C.F.R. §§ 36.401, 36.402.  Neither an entity's size or financial ability to comply with the ADAAG, nor the cost of compliance are considerations under either of these standards. Id.

The ADA contains different accessibility standards for facilities that were constructed for first occupancy prior to January 26, 1993, often referred to as "existing facilities".  Public accommodations must only remove barriers to accessibility if such removal is "readily achievable".  See 42 U.S.C. § 12182(b)(2)(A)(iv); 28 C.F.R. § 36.304.  Unlike the case with new construction and alterations, the DOJ has exclusive jurisdiction to set standards for barrier removal in existing facilities. See 36 C.F.R. § 1191, Appendix B at § 101.2; DOJ Advanced Notice of Proposed Rule Making ("DOJ ANPRM"), 69 Fed. Reg. 58,768, 58,769 (Sept. 30, 2004).

### 3.     The Rulemaking Process for the Revised ADAAG

In 1994 – three years after issuing the ADAAG – the Access Board began working on a comprehensive revision. See Motion to Dismiss at 6.  That effort resulted in the publication of a Proposed Rule in the Federal Register on November 16, 1999. Id. The Access Board certified that the Proposed Rule would have "no significant economic impact" under section 605(b) of the RFA and conveniently avoided the need for completing an IRFA. Id.  NFIB, as well as the Small Business Administration (SBA),

---

documents, and are not easily understood by people who do not have special training on accessibility requirements. See Compl. ¶ 18.

both filed comments objecting to the certification and insisting that the Access Board conduct a regulatory flexibility analysis.  See Compl. ¶ 20.

The Access Board ignored SBA and NFIB's requests.  On July 23, 2004, the Access Board published the 304-page Revised ADAAG as a final rule in the Federal Register without having conducted a regulatory flexibility analysis and again certified that the rule had no significant economic impact on a substantial number of small entities. See 69 Fed. Reg. at 44,084; Motion to Dismiss at 7.  The DOJ, as a federal member of the 25-person Access Board, "was extensively involved in the development of the [Revised] ADAAG" and voted for its approval, even though no regulatory flexibility analysis had been conducted.  DOJ ANPRM, 69 Fed. Reg. at 58,769.

> **4.    The DOJ's Process for Adopting the Revised ADAAG And The Limitation On Its Ability To Go Below The Baseline Set By The Access Board**

On September 30, 2004, the DOJ announced its intention to adopt ADA accessibility standards "consistent with" the Revised ADAAG.  DOJ ANPRM, 69 Fed. Reg. at 58,768 (emphasis added).  The DOJ further stated in the DOJ ANPRM that "[t]he ADA requires the Department to publish regulations that include enforceable accessibility standards applicable to facilities subject to the Title II and Title III that are consistent with the minimum guidelines issued by the Access Board."  Id. at 58,769 (emphasis added).

The DOJ made clear in the DOJ ANPRM that it would not face similar constraints in developing regulations for existing facilities.  The DOJ stated that "[h]ow and to what extent the Access Board's guidelines are used with respect to the readily achievable barrier removal requirement applicable to existing facilities under Title III of the ADA . . . is solely within the discretion of the Department of Justice."  Id.

403279 v 2

9

### 5.     The Impact Of The Revised ADAAG On NFIB Members

The types of public accommodations that will be required to comply with the Revised ADAAG once it is incorporated into the DOJ regulations include, but are not limited to: restaurants, bars, retailers, dry cleaners, professional and other service providers, day care centers, theatres, parking lots and garages, parks, schools, museums, galleries, transient lodgings (even those with only one guestroom), health clubs, and recreation facilities. A substantial number of these public accommodations are owned and operated by small entities and are members of NFIB. See Compl. ¶ 24; Harned Decl. ¶ 3.

The Revised ADAAG imposes a number of new requirements on public accommodations and commercial facilities constructed for first occupancy after January 26, 1993, or altered after January 26, 1992, that will have a significant monetary impact on small entities, including the following:

- Increasing the number of required van accessible parking spaces to one in every six accessible spaces from one in eight.

- Increasing the percentage of public entrances which must be accessible from 50 to 60 percent and, in the case of a facility with two entrances, requiring both to be accessible.

- A new requirement (with some exceptions) that circulation paths inside of employee work areas that are larger than 1000 square feet comply with accessibility requirements.

- A new requirement that platform lifts have power-operated doors (for lifts serving more than two landings) and self-closing doors (for lifts serving two or fewer landings). The ADAAG only requires that platform lifts have doors with maneuvering clearance or be power-operated.

- A new requirement that at least 5% of sinks in each accessible space comply with the technical requirements for sinks, including knee and toe clearance, clear floor space, height, faucets, and insulated

403279 v 2

pipes and surfaces.  The ADAAG does not specify the number of sinks that must accessible.

- A new requirement that if non-accessible guest rooms in transient lodging facilities have a vanity, the accessible guest rooms must have a comparable vanity.  There is no existing requirement under ADAAG for this.

- A new set of specifications for handrails along walkways if handrails are provided.  No such specifications exist under the ADAAG.

- A new requirement that sliding doors that are part of an accessible route have thresholds of ½ an inch or less.  The ADAAG allows thresholds for such doors to be ¾ an inch high.

- A new restriction that does not allow a lavatory to be located within the minimum mandatory clear floor space around an accessible toilet.  The ADAAG allows the lavatory to be located within this clear floor space.

- A new requirement that at least one window in accessible guest rooms must meet accessibility requirements such as special hardware which can be operated with one hand and does not require tight grasping, pinching, or twisting of the wrist, and operable parts that are no higher than 48" from the finished floor.  The ADAAG has no such requirement.

See Compl. ¶ 25.

## III.    ARGUMENT

On a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), the plaintiff bears the burden of establishing that the court has jurisdiction.  See Brady Campaign to Prevent Gun Violence United with the Million Mom March v. Ashcroft, 339 F. Supp. 2d 68, 72 (D.D.C. 2004).  However, "[a] [c]ourt must accept all the non-movant's factual allegations as true when reviewing a motion to dismiss under Rule 12(b)(1)." Id. at 72-73.  In addition, the Supreme Court has made clear that when the plaintiff's standing is challenged "[a]t the pleading stage, general factual allegations of injury resulting from the defendants' conduct may suffice, for on a

motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim." Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) (internal citations and quotations omitted).  In addition, the court "may consider material beyond the allegations in the plaintiff's complaint when determining whether it has subject matter jurisdiction pursuant to Rule 12(b)(1)." Brady Campaign, 339 F. Supp. 2d at 73.

As shown below, NFIB's claim can and should be reviewed now.  NFIB has standing to challenge the Access Board's failure to comply with the mandates of the RFA in its rulemaking, and NFIB's claim is fully ripe for review.  For these reasons, this Court has jurisdiction to hear this controversy.

### A.    NFIB Has Standing To Challenge the Access Board's Failure to Comply with the RFA on Behalf of its Members

A trade association such as NFIB has standing to bring suit on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt v. Washington State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977).  The Access Board does not dispute that the facts alleged in the Complaint are sufficient to establish the second and third requirements for organizational standing, and only challenges NFIB's standing based on the first requirement.[3]  The

---

[3]    With regard to the organizational purpose requirement, the Complaint seeks the Access Board's compliance with the RFA – a statute enacted by Congress to protect small entities from unnecessary regulatory burdens.  The Complaint and the Harned Declaration both state that one of NFIB's missions is to, through the vehicle of judicial review, ensure that federal and state regulators faithfully abide by the laws that were enacted to protect America's small businesses, including the RFA.  See Compl. ¶ 3; Harned Decl. ¶ 2.  Thus, the interests NFIB seeks to protect in this lawsuit are germane to

discussion below demonstrates that the many small business members of NFIB that are owners and/or operators of public accommodations and/or commercial facilities would have standing to bring this lawsuit in their own right. Accordingly, NFIB has standing to bring this suit on behalf of these small businesses.

Both the Supreme Court and the D.C. Circuit have made clear that the standing requirements for a challenge to an agency's failure to comply with legally mandated procedures is considerably less stringent than for a challenge to the substance of an agency rule. In Lujan, the Supreme Court first set out the three familiar requirements of Article III standing as follows:

> First, the plaintiff must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. . . . Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be fairly trace[able] to the challenged action of the defendant, and not the result [of] . . . some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Id. at 560-561 (internal citations and quotations omitted). The Court then went on to explain that the standing analysis is different for cases involving a denial of a procedural right.

> There is this much truth to the assertion that "procedural rights" are special: The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy. Thus, under our case law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an

---

its purpose. With regard to the second requirement relating to member participation, it is clear that judicial review of the Access Board's compliance with the RFA and an injunction mandating such compliance would not require the participation of any individual members, because the entire case is based on the already fully developed agency record. See Compl. ¶¶ 27-29.

environmental impact statement, <u>even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years.</u>

504 U.S. at 573 n.7 (emphasis added).[4]

In <u>Wyoming Outdoor Council v. United States Forest Service</u>, 165 F.3d 43, 51 (D.C. Cir. 1999), the D.C. Circuit further explained that in cases involving an alleged violation of a procedural right, the necessary showing to support the constitutional minimum of injury in fact, causation, and redressability is "reduced." In <u>National Treasury Employees Union v. United States</u>, 101 F.3d 1423 (D.C. Cir. 1996), the D.C. Circuit stated that "in cases . . . where a procedural violation is asserted, <u>the courts have applied the imminence requirement to the procedural violation</u>, not the discrete injury that might someday flow from such." <u>Id</u>. at 1430-1431 (emphasis added).

Applying these concepts, the D.C. Circuit recently held in <u>Electric Power Supply Association v. Federal Energy Regulatory Commission</u>, 391 F.3d 1255, 1262 (D.C. Cir. 2004) ("<u>EPSA</u>"), that the possibility of the plaintiff's members being denied a fair hearing sometime in the future as a result of the Federal Energy Regulatory Commission's (FERC) adoption of two orders allowing for certain <u>ex parte</u> communications by third-parties with the agency – in possible violation of the Sunshine Act – was a sufficient injury in fact to satisfy Article III's standing requirements. <u>Id</u>. FERC had argued that EPSA did not have standing because the orders allowing the <u>ex</u>

---

[4]      Notwithstanding this statement, the Court found that the plaintiff had no standing because its members had no "concrete interests" in the matter. They were, in the Court's words, "persons who live (and propose to live) at the other end of the country from the dam," meaning that they would never be affected by the dam construction under virtually any set of circumstances. NFIB members, in stark contrast, are owners and/or operators of public accommodations and/or commercial facilities that will be stringently regulated by the terms of the Revised ADAAG.

parte communications could not cause current or future injury to the financial interests of the plaintiff. Id. at 1262. Rejecting this argument, the D.C. Circuit found that as participants in contested FERC proceedings, the plaintiff's members have a right to "fair decision-making," which is protected by the Sunshine Act. "This, not the financial interests of EPSA and its members, is the right directly protected by [the Sunshine Act] and impaired by the [orders]." Id. It should be noted that the Court held that the plaintiff had satisfied the injury in fact requirement even though there was no allegation that FERC had actually engaged in the procedural violation, namely, actually having ex parte communications with market monitors. The challenged orders merely made the procedural violation imminent.

Lujan, Nat'l Treasury, Wyoming Outdoor Council, and EPSA all stand for one fundamental legal principle: When a lawsuit challenges an agency's compliance with a legally mandated procedure, the injury in fact occurs when the agency fails to comply with the procedure or when the failure to comply is imminent. In NFIB's case, the Access Board violated the RFA's procedural requirements more than a year ago when it finalized the Revised ADAAG without having conducted a regulatory flexibility analysis and justifying its decision by making a baseless certification of "no significant economic impact". See Motion to Dismiss at 7. Thus, the injury to the NFIB members' legal interest in having a decision making process that considers the impact of the regulatory action on their small business interests has already occurred and clearly satisfies Article III's injury-in-fact requirement. [5]

---

[5]    The Access Board's reliance on National Treasury is misplaced because in that case, the new process for making federal law created by the challenged Line Item Veto had not gone into effect, so that the plaintiff had not been subject to any allegedly

The injury to NFIB members is also "fairly trace[able]" to the challenged action of the Access Board, and not the result of some third party not before the Court. Lujan, 504 U.S. at 560. By issuing the Revised ADAAG without complying with the procedures mandated by the RFA, the Access Board trammeled upon the rights conferred by the RFA upon small businesses to have their interests considered in the rulemaking process. The Access Board is solely responsible for this injury to the procedural rights of NFIB members.

It is also clear that NFIB members' injury will "likely . . . be redressed by a favorable decision by this court." Id. at 561. If this Court finds that the Access Board violated the RFA, it has the authority under that statute to order the Access Board to rescind the Revised ADAAG and comply with the RFA, thereby restoring NFIB members' right to a rulemaking process that considers their interests. See 5 U.S.C. § 611(a)(4).

### B.    NFIB's Claim Can Never Get More Ripe

The Court has jurisdiction over NFIB's claim that the Access Board violated the RFA because the claim can never get riper.

As set forth above, NFIB has demonstrated that its members have suffered an injury in fact sufficient to establish Article III standing. Accordingly, it need only meet the prudential requirements of the ripeness doctrine. See Nat'l Treasury, 101 F.3d at 1428. As with standing, the Access Board's ripeness analysis fails to consider the critical fact that NFIB is asserting its members' procedural rights. The D.C. Circuit has allowed

---

unlawful procedures. See Nat'l Treasury, 101 F.3d at 1431. In the instant case, the procedural violation/injury has already occurred: The Access Board promulgated the revised guidelines as a final rule and did not follow the requirements of the RFA.

403279 v 2

RFA challenges to be brought immediately upon an agency's failure to comply with RFA

procedures, regardless of whether the rule has actually been applied to the organization's

members. See National Association of Home Builders v. United States Army Corp of

Engineers, 417 F.3d 1272, 1282, 1286 (D.C. Cir. 2005).

In Nat'l Ass'n of Home Builders, NFIB was one of several trade associations that

brought an action challenging the Army Corp of Engineer's issuance of new nationwide

permits ("NWPs")[6] with more restrictive conditions, which had the effect of requiring

NFIB members to apply for more individual permits. Id. at 1275-77. The suit involved

both a substantive challenge on the new NWPs as arbitrary, capricious, and contrary to

law under the Administrative Procedures Act (APA), as well as a procedural challenge

based on the agency's failure to comply with the RFA in issuing these new NWPs. See

417 F.3d at 1282, 1286.

Relevant to the present case is the fact that the D.C. Circuit conducted two distinct

ripeness inquiries for the substantive APA challenge and the RFA challenge. For the

attack on the substance of the permit conditions, the court applied the usual two prong

approach which examines "the fitness of the issues for judicial review and the hardship to

the parties of withholding court consideration." Id. at 1281 (internal citations and

quotations omitted). For the RFA claim, the court's analysis was much more brief, as

follows:

> [t]he Supreme Court has admonished that procedural rights are special and
> that a person with standing who is injured by a failure to comply with the
> NEPA procedure may complain of that failure at the time the failure takes
> place, for the claim can never get riper. The RFA, similar to NEPA in the
> environmental sphere, requires an agency to evaluate the adverse

---

[6]    NWPs are general permits that allow the discharge of dredged or fill material by
entities without having to apply for and obtain individual permits. Id. at 1275-76.

economic effects of and less harmful alternatives to its actions before taking them. Thus, <u>as with a NEPA challenge, the appellants may complain of the Corps' failure to comply with the procedures set forth in sections 604 and 605 of the RFA at the time the failure occurred, i.e. when the Corps issued the NWPs without complying with those procedures. In sum, the appellants' RFA challenge can never get riper.</u>

<u>Id</u>. at 1286 (internal citations and quotations omitted) (emphasis added).

    <u>Nat'l Ass'n of Home Builders</u> is controlling precedent in this case. As in that case, NFIB's claim here can never get riper. The Access Board has issued the Revised ADAAG as a final rule without complying with the RFA, and there is no further action that will be taken by the agency that could possibly be relevant to NFIB's claim. <u>See also</u> <u>Wyoming</u>, 165 F.3d at 51 (holding that the claim that the agency implemented procedures that violated its own regulations "can never get riper" because "no further actions will be taken by the [agency] that may be relevant to [plaintiff's claim"); <u>EPSA</u>, 391 F.3d at 1263 (finding association's challenge to FERC's issuance of order allowing for certain <u>ex parte</u> communications in contested proceedings ripe because "no further factual development is necessary to clarify the issue before the court . . . . [N]othing would be gained by postponing resolution of [the plaintiff's] challenge"). The question of the lawfulness of the Access Board's basis for not conducting a regulatory flexibility analysis as required by the RFA can be answered by examining the statute itself, the Act's legislative history, its construction by relevant case law, and the regulatory assessment that it relied upon to conclude that no regulatory flexibility analysis was required. <u>See</u> Motion to Dismiss at 7 (stating the Access Board's reliance on the regulatory assessment).

    Even if the Court were to apply the traditional two-pronged test for ripeness in cases that involve substantive, as opposed to procedural rights, this case is still ripe for

judicial review. First, as stated above, the case is plainly fit for judicial review because the Access Board's process is complete and no additional information is necessary for the Court to decide the question of whether the agency complied with the RFA. Second, "the relative hardship to the parties of withholding consideration" plainly favors NFIB. Nat'l Treasury, 101 F.3d at 1431.

On the one hand, neither the Court nor the Access Board has a significant interest in postponing review. The Access Board issued the Revised ADAAG on July 23, 2004, and there is no suggestion that the agency has plans to take any further action with regard to this final rule. On the other hand, NFIB's right to challenge the Access Board's failure to comply with the RFA will be made meaningless if the Court dismisses this case and delays its consideration until the DOJ completes its independent rulemaking process. If the Court does not now consider whether the Access Board complied with the RFA, the DOJ will continue its rulemaking process and utilize the Revised ADAAG as a "baseline" for the new regulations. Once that process is complete, a court will be reluctant to require the DOJ to undo its entire regulatory process even if it finds that the Access Board did not comply with the law when it promulgated the Revised ADAAG. In addition, it is unclear whether NFIB or anyone else can bring an action challenging the Access Board's non-compliance with the RFA once the DOJ's process is complete because the RFA's statute of limitations for requesting judicial review of an agency's non-compliance is one year from the date the issuance of the final rule. 5 U.S.C. § 611 (a)(3)(A). That deadline, July 23, 2005, has already passed. Absent a judicial determination that the statute of limitations to challenge the Access Board's non-compliance with the RFA is tolled pending the DOJ's adoption of the Revised Guidelines

into its regulations, the Access Board's non-compliance with the RFA will escape judicial review.

**C.    The DOJ's Imminent Adoption Of The Revised ADAAG Does Not Change The Jurisdictional Analysis.**

The Access Board claims that NFIB's members have not suffered an imminent injury in fact because the DOJ has not yet completed its process of incorporating the Revised ADAAG into its regulations and, therefore, NFIB's members have suffered no harm.  The Access Board also tries to suggest that there are many decisions that the DOJ might make in its regulatory process that will affect how the Revised ADAAG will affect NFIB's members.  These arguments have absolutely no merit.

The discussion in Section III.A.1 supra disposes of the first argument by demonstrating that, in cases like this one involving a violation of procedural rights, the injury occurs when the procedural violation takes place.  See Nat'l Treasury, 101 F.3d at 1431 ("[T]he courts have applied the imminence requirement to the procedural violation, not the discrete injury that might someday flow from such.").  The Access Board's violation of NFIB members' procedural rights under the RFA took place more than a year and a half ago when the Board decided to issue a baseless certification in lieu of conducting a regulatory flexibility analysis.  See Compl. ¶ 29.  What DOJ might do with the Revised ADAAG in the future is completely irrelevant to the standing analysis for a challenge to the Access Board's procedural violation.

The Access Board's second argument that the injury to NFIB's members is speculative because of decisions that the DOJ might make during its regulatory process is also without merit and borders on the disingenuous.  The Access Board has unequivocally and repeatedly stated that its Revised ADAAG is the minimum "baseline"

403279 v 2

20

from which DOJ must operate, and the DOJ has stated that it must adopt regulations which are "consistent with the minimum guidelines". <u>See</u> Motion to Dismiss at 5; DOJ ANPRM, 69 Fed. Reg. at 58,769. If these agency pronouncements are legally correct, then there is little that the DOJ can do to change the onerous baseline standards of the Revised ADAAG even if it concludes, during its own regulatory flexibility analysis, that less stringent standards for small businesses would not adversely impact accessibility.[7] For this reason, the Access' Board's claim that "until DOJ revises its standards, the extent to which plaintiff's members will be affected is unknown" is a half-truth. <u>See</u> Motion to Dismiss at 15. The only thing that is "unknown" is whether the DOJ will revise its standards to make its regulations even more burdensome than the "baseline" prescribed by the Access Board. What is certain, based on the Access Board's and the DOJ's past

---

[7]     If the Court finds that the answer to the question of whether the DOJ has the discretion to go below the "baseline" set by the Revised ADAAG for new and altered facilities is unclear but necessary for it to determine its jurisdiction, NFIB suggests that the Court request a submission from the DOJ setting forth its position on this issue.

NFIB maintains that, as a matter of law, the Access Board has no authority to issue minimum guidelines that are binding on the DOJ, and the DOJ has full discretion to adopt any appropriate accessibility standards under the ADA for new construction and alterations. The Supreme Court has held that "any appointee exercising significant authority pursuant to the laws of the United States is an 'Officer of the United States,' and must, therefore, be appointed in the manner prescribed by [the Appointments Clause of the Constitution]." <u>Buckley v. Valeo</u>, 424 U.S. 1, 126 (1976). In <u>Buckley</u>, the Court held that administrative powers that include "rulemaking and advisory opinions" can only be exercised by persons who are "Officers of the United States." <u>Id.</u> at 140-41. Officers of the United States must be appointed by the President with the advice and consent of the Senate. <u>Id.</u> at 126. The thirteen public members of the twenty-five member Access Board were not confirmed by the Senate and are not, therefore, "Officers of the United States" who have the authority to engage in making law. For this reason, the Revised ADAAG should be viewed as entirely advisory in nature and in no way binding on the DOJ in its rulemaking process.

pronouncements, is that the DOJ regulations will, at a minimum, adopt the requirements contained in the Revised ADAAG.

Furthermore, the items identified by the Access Board as being "under consideration" by the DOJ in its rulemaking (see Motion to Dismiss at 13) are completely irrelevant to the standing analysis because none of them could have any impact on the substantive obligations imposed by the "baseline" standards set by the Access Board. Specifically, the delay in the effective date for the Revised ADAAG being considered by the DOJ does not change the substance of the "baseline" requirements. Likewise, the "safe harbor for barrier removal" in existing facilities under consideration by DOJ has absolutely nothing to do with the Revised ADAAG, which applies only to new construction and alterations. As stated, unlike the accessibility standards for new construction and alterations, the DOJ has full discretion with regard to the standards for "barrier removal" in existing facilities. See discussion supra at 9.

In sum, if the DOJ and the Access Board's pronouncements and the logical conclusion to be drawn from them are correct, then the DOJ has no discretion to adopt less stringent accessibility standards than those illegally prescribed by the Access Board for newly constructed or altered facilities. There is absolutely no question, therefore, that the minimum baselines contained in the Revised ADAAG will apply to NFIB's members and nothing the DOJ can do in its process will change this fact.

## IV.    CONCLUSION

For the reasons set forth above, the Court has jurisdiction over this matter and the

Access Board's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1)

should be denied.

Respectfully submitted,


EPSTEIN BECKER & GREEN, P.C.


Minh N. Vu
(D.C. Bar No. 444305)
Frank C. Morris, Jr.
(D.C. Bar No. 211482)
1227 25th Street, N.W.
Washington, D.C. 20037
(202) 861-0900
(202) 296-2882 (fax)

Counsel for Plaintiff

OF COUNSEL:

Karen R. Harned
(D.C. Bar No. 456803)
Elizabeth Gaudio
(D.C. Bar No. 458688)
NFIB Legal Foundation
1201 F Street, NW
Suite 200
Washington, DC 20004
Telephone:  (202) 314-2061
Facsimile:   (202) 484-1566


Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I certify that on October 28, 2005, a copy of the foregoing Plaintiff's

Memorandum in Opposition to Defendant's Motion to Dismiss and the exhibits thereto

was sent to the attorneys identified below by First Class Mail.

Stuart A. Licht, Esq.
Marsha S. Edney, Esq.
U.S. Department of Justice
Federal Programs Branch
20 Massachusetts Avenue, N.W. Room 7148
Washington, D.C. 20530

Mian N. Vu